UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

FREDERICK DIAZ,

                          Plaintiff,

        -vs-                          **No. 6:10-CV-6595(MAT)**
                                      **DECISION AND ORDER**
ROBERT BURNS, Correction Officer;
JOHN F. MORAN, Correction Officer;
FREDERICK W. KINTZEL, Sergeant; T.
ZERNIAK, Lieutenant; ROBERT A.
KIRKPATRICK, Superintendent; NORMAN
R. BEZIO, Director, Special
Housing; BRIAN FISCHER,
Commissioner, NYSDOCS,
                          Defendants.

---

## I.    Introduction

     Plaintiff Frederick Diaz ("Plaintiff" or "Diaz"), proceeding
pro se, instituted this action  pursuant to 42 U.S.C. § 1983
against defendants, who are employees of the New York State
Department of Corrections and Community Supervision ("DOCCS").
Plaintiff is now represented by Thomas D. Terrizzi, Esq. Presently
before the Court is the partial motion for summary judgment
(Dkt #21) pursuant to Rule 56 of the Federal Rules of Civil
Procedure ("F.R.C.P.") filed by defendants Lieutenant T. Zerniak
("Lt. Zerniak") and DOCCS' Director of Special Housing/Inmate
Discipline Programs Norman Bezio ("Director Bezio"). Plaintiff has
filed a partial cross-motion for summary judgment (Dkt #26) against
Lt. Zerniak and Director Bezio. For the reasons discussed below,
Plaintiff's motion for summary judgment is granted in part and

denied in part. The summary judgment motion filed by Lt. Zerniak and Director Bezio is denied in its entirety.

## II. Factual Background

The following factual summary is taken from the parties' pleadings, attached exhibits, and discovery responses. Except where indicated, the facts recited below are not in dispute.

### A. Plaintiff's Transfer and the Inmate Election

Plaintiff was transferred to Wende Correctional Facility ("Wende") on September 14, 2007. His first program assignment was to be an office clerk for the Inmate Grievance Response Committee ("IGRC"), a position he had held at other facilities. However, on November 20, 2007, the Deputy Superintendent of Programs at Wende sent Plaintiff a memo stating, without explanation, that it "would not be conducive to the safety, security and good order of the facility" for him to hold the position of office clerk with the IGRC, and he would not be permitted to work in that position. See Memorandum of K. Crowley, dated 11/20/07, Diaz Ex.[1] A (Dkt #23-1).

Plaintiff then ran for election as an IGRC inmate representative in March 2008. Plaintiff won a position as

---

[1]

The Court will refer to the exhibits attached to the Declaration of Thomas Terrizzi, Esq. ("Terrizzi Decl.") (Dkt #28) as "Terrizzi Ex." The exhibits attached to the Affidavit of Frederick Diaz ("Diaz Aff.") (Dkt #23) will be referred to "Diaz Ex." The exhibits attached to the Declaration of Hillel Deutsch, Esq. ("Deutsch Decl.") (Dkt #21-4) will be cited as "Deutsch Ex." The exhibits attached to the Deutsch Decl. are unpaginated, even on CM/ECF, and the Court therefore is unable to provide pinpoint page citations.

representative, as did his fellow inmate Luis Rosales ("Rosales"). See Diaz Aff., ¶ 1. On the day Plaintiff and Rosales received the election results, Plaintiff alleges that an inmate worker in the IGRC office told Rosales that he had "overheard the grievance Staff Sgt. [Sindoni] and the staff Supervisor [Northrup] talking about the election results. They said that if both Luis [Rosales] and [Diaz] did not resign before [they] started, [they] would get a ticket out of Wende by way of SHU." Diaz Aff., ¶ 1, p. 2 (citing Testimony of Luis Rosales from 4/17/08 Disciplinary Hearing ("the First Hearing"), Diaz Ex. C (Dkt #23-3)). Rosales relinquished his position before their term commenced, but Plaintiff did not resign. See Letter from Luis Rosales to Brian Fischer, Commissioner of DOCCS ("Commissioner Fischer") dated 3/28/08, Diaz Ex. B (Dkt #23-2).

**B.    The April 7, 2008 Use of Force Incident**

On April 7, 2008, the first day of his new term as an IGRC representative, Plaintiff avers that he was walking out of his housing gallery to go to the law library when Corrections Officer Robert Burns ("CO Burns") punched him in his right eye as he stepped past the exit gate on the gallery. Plaintiff, who had never met CO Burns, states that he yelled, "What did you do that for?" Diaz Aff., ¶ 1, p. 2.

According to the Misbehavior Report issued by CO Burns, when he (CO Burns) opened Diaz's cell so he could go to his library

call-out, Diaz walked past him and, "without provocation, punched [him] in the left eye with his right fist[,]" after which CO Burns "punched Diaz in the face with [his] right fist." Misbehavior Report, Terrizzi Ex. G1a (Dkt #28-1). CO Burns indicated that fellow officers Sgt. Kintzel and CO Moran responded to the area, and CO Moran helped CO Burns apply "body holds to gain control of Plaintiff and take him to the floor." Id. Plaintiff then was taken to the medical unit. At some point after the incident, Plaintiff was interviewed by a psychologist from the Office of Mental Health ("OMH"), Dr. Bush.

As a result of the Misbehavior Report filed by CO Burns, Plaintiff was charged with Violent Conduct (104.11), Creating a Disturbance (104.13), Assault on Staff (100.11), and Interference with Employee (107.10). See, e.g., Hearing Record Sheet, Terrizzi Ex. B (Dkt #28-2).

### C. The April 2008 Tier III Disciplinary Hearing

A Tier III disciplinary hearing ("the First Hearing") was held on April 17 and April 24, 2008, regarding the April 7, 2008 Misbehavior Report. Civilian hearing officer James Kennedy ("CHO Kennedy") presided, and allowed Plaintiff to call inmate Rosales, inmate James Bumpus ("Bumpus"), inmate Ricardo Squires ("Squires"), and CO Burns.[2]

---

[2]

Plaintiff provided his attorney with two audiotapes which he received in response to a Freedom of Information Law ("FOIL") request from Wende, and from these, his attorney transcribed the testimony given by CO Burns, Rosales, and

CO Burns testified as follows:

> Basically I cracked [Plaintiff] out for his law library call out. When he came to the front of the company, he struck me. I struck him back. Grabbed him by the shoulder, like the top of his body area. Brought him to the floor. Officer Moran came and some other officers came. And he was cuffed and brought to the RMU.

Transcript of CO Burns' Testimony on 4/17/08, Diaz Ex. D (Dkt #23-4, p. 2 of 9). When CO Burns was asked by CHO Esgrow, on Plaintiff's behalf, if he had "a recollection exactly how" he was struck, CO Burns responded, "I, um, he struck me with his right hand in my left eye." Id. When asked if he remembered what part of Plaintiff's face he (CO Burns) hit, CO Burns testified, "I just hit him in the face, I mean, I'm pretty sure it's the right eye, his left eye, his left eye."[3] Id., p. 4 of 9.

Bumpus, an inmate porter, testified on Plaintiff's behalf that he was in the "slop sink room" when he heard a "ruckus". Testimony of James Bumpus on 4/17/08, Terrizzi Ex. K (Dkt #28-10). Bumpus related that, looking through the gallery gate, he saw CO Burns behind Diaz holding Diaz's arms. Bumpus testified that CO Moran then "jumped on the front part of [Plaintiff's] body and punched

---

Bumpus at the First Hearing. Copies of the transcripts are attached as Diaz Ex. C (Dkt #23-3) (Rosales' Testimony) and Diaz Ex. D (Dkt #23-4) (CO Burns' Testimony). The relevant portion of Bumpus' testimony from the First Hearing is attached as Terrizzi Ex. K (Dkt #28-10).

[3]

However, Plaintiff's medical records and the photos of his injury show an abrasion near his right eye and a discoloration resulting from bleeding underneath the skin, but no injuries or marks on the left side of his face. See Medical Records, Terrizzi Ex. G1 (Dkt #28-1, pp. 9-11 ("R[ight] lateral eye, slight abrasion, ecchymosis developing. . . [s]uperficial abrasion (small) L[eft] flank. . . [l]eft shoulder slight redness")); Post-Incident Photos of Plaintiff, Terrizzi Ex. G2 (Dkt #28-3).

him in the face, and said, 'You should have took [sic] Sgt. Sidoni's advice and resigned.'" Id., Dkt #28-10, p. 2 of 4. Bumpus said a "bunch of officers ran up the steps" and "were telling him to shut his pie hole" while Diaz "kept saying[,] 'What is this about[?]'" Id., p. 3 of 4. Bumpus stated that there was an inmate in "two cell" who was "also on the gate . . . saying 'Yo, why you doin' that to him. He ain't doin' nothin'. Why you doin' that to him. He ain't doin' nothing.'" Id., p. 4 of 4.

Squires' testimony from the First Hearing was not provided to the Court. Based on the records available to the Court, and Plaintiff's statements at the subsequent hearing, it appears that when Squires was called, he testified that "he didn't know anything about it and he didn't want to testify." RH.5[4] (Dkt #28-4, p. 6 of 91).

Inmate Rosales testified that on the night he and Diaz won the IGRC election, he was told by an inmate worker in the IGRC Office that the staff supervisors in that office said that if Rosales and Diaz went to work as IGRC representatives, the IGRC staff supervisors were going to set them up and put them "in the box[,]" meaning, have them confined in the Special Housing Unit ("SHU"). See Testimony of Luis Rosales on 4/17/08, Diaz Ex. C (#23-3, pp. 2-3 of 3). Rosales said that he "also received information from

---

[4] Citations to "RH.__" refer to pages from the transcript of the Rehearing, attached as Terrizzi Ex. D (Dkt #28-4) and as part of Deutsch Ex. A (Dkt #21-4).

[his] [sic] staff that told [him] not to go out there because they were setting [him] up like they did in 2006, which conducted [sic] the hearing at that time and [he] beat the ticket but in the courts." Id., p. 3 of 3.

Plaintiff requested OMH psychologist Dr. Bush who had interviewed him after the incident on April 7, 2008. According to Plaintiff, Dr. Bush was asked to "get a psychological profile" of him. Diaz Aff., ¶ 29. Diaz states that CHO Kennedy did not call Dr. Bush as a witness. Id.

Inmate Kenneth Jones ("Jones") was interviewed by Plaintiff's employee assistant, J. McGregor ("CO McGregor"), on April 9, 2008, at which time Jones agreed to testify. However, on April 24, 2008, Jones signed an "Inmate Refusal Testify" form. The reason given for refusing to testify was that he "d[id]n't want to be involved". See Inmate Refusal Testify Form signed by Kenneth Jones, Deutsch Ex. A.

The First Hearing concluded on April 24, 2008, at which time CHO Kennedy found Plaintiff guilty of all charges. See Superintendent Hearing Disposition Rendered, dated 4/24/08, Deutsch Ex. A. CHO Kennedy agreed that it made "little, if any, sense" for Plaintiff to punch a corrections officer he did not know, but he also found it "equally senseless" that CO Burns "would engage in a massive conspiracy" to assault him and file false documents, "thereby committing criminal acts, simply for the purpose of retaliating against" Plaintiff. Id. Because CHO Kennedy found

"substantial evidence" to support the violations charged, he entered guilty findings and imposed the following penalties: 12 months of confinement in SHU and 12 months' loss of packages, commissary, and phone privileges. Id.

Plaintiff administratively appealed the adverse disciplinary finding. Director Bezio reversed CHO Kennedy's decision without explanation and ordered a new hearing. See Review of Hearing dated 6/13/08, Terrizzi Ex. I (Dkt #28-8).

### C. The Rehearing

Lt. Zerniak, who was an Acting Captain at that point, conducted the Rehearing, which commenced on June 22, 2008. Plaintiff testified that he "never even touched [CO Burns]" but instead CO Burns "just [went] and sucker punched [him] in the face[,]" RH.7, on the right side of his right eye, RH. 9. Plaintiff testified that he asked CO Burns, "[W]hat the hell did you do that for[,]" RH.9, and CO Burns replied, "[Y]ou won't be working in grievance no more mother fucker." Id. Plaintiff related that additional corrections officers then came up the steps and "pounded on [him][,]" which he argued to Lt. Zerniak was "their way of getting [him] out of the grievance office." Id.

As character witnesses at the Rehearing, Plaintiff requested Wende Deputy Superintendent of Security Sticht, Wende CO Kwas, and

Wende CO Martin[5], which Lt. Zerniak denied. RH.17, 23. Plaintiff also requested Investigator James Kessel ("Inv. Kessel") of DOCCS' Inspector General's Office, as well as OMH psychologist Dr. Bush, who had interviewed him after the incident "to get a psychological profile of [him]." RH.18. Lt. Zerniak denied Inv. Kessel and Dr. Bush as witnesses. RH.23. Lt. Zerniak's reason for denying all of these individuals as witnesses was that they "were not in the area of the alleged incident" and had "no knowledge" of it. RH.23.

As far as inmates, Plaintiff requested Rosales, Bumpus, and Squires, who had testified at the First Hearing. RH.18. Plaintiff was permitted to read into the record Rosales' March 28, 2008 letter to Commissioner Fischer in which Rosales described a plan by Wende IGRC staff to retaliate against him and Plaintiff for their participation on the IGRC. See RH.20-22. Rosales, who was still at Wende, testified by phone. Lt. Zerniak ask if "all of the knowledge" Rosales had of the April 7, 2008 incident was contained in the letter he wrote to Commissioner Fischer (which Plaintiff had already read into the record), and Rosales said yes. Lt. Zerniak then refused to allow Plaintiff to ask any further questions of Rosales. RH.28-29.

---

[5]

Plaintiff testified that CO Kwas and CO Martin were the regular officers on his gallery at Wende. RH.19-20. CO Burns testified that he was a "recourse officer" and was filling in on Plaintiff's gallery on the day of the incident; he had had no dealings with Plaintiff prior to that day. RH.30.

Squires, who testified by phone, stated that he was "not too far from the gate [on 15 gallery] . . . in 4 cell" when he "heard a lot of commotion and all [he] heard was Diaz screaming out what are you hitting me fore [sic]?" RH.25. Squires then heard a corrections officer say, in reply to Diaz, "something about the grievance office." RH.26. According to Squires, "everyone from 4 cell to 1 cell" heard it. Id. Plaintiff asked if he could "refresh [Squires'] memory from the last hearing"[6] but Lt. Zerniak declined, stating, "we are dealing with this incident." RH.26. Plaintiff wanted to ask Squires if it sounded as though he hit the corrections officer, but Lt. Zerniak refused because "sounds are sounds that's irrelevant he did not see anything." RH.27.

CO Burns testified by phone from Wende. When asked where Diaz punched him, CO Burns replied, "In my head[.]" RH.30. Plaintiff attempted to ask if CO Burns "recall[ed] if [he] did anything else after that" for purposes of "getting the details exactly how the supposed assault went down." RH.30, 31. Lt. Zerniak stated, "[Y]ou punched him, and then force took place. I don't need to ask him[.] [D]o you have anything else to ask." RH.31. Plaintiff requested that Lt. Zerniak ask CO Burns "where exactly did he hit [Plaintiff]." Id. CO Burns responded, "[I]n his head." Id. Lt.

---

[6]
The Court infers from Diaz's question that Squires provided more detailed testimony at the First Hearing. However, as noted above, the Court has not been supplied with a complete copy of the transcript of the First Hearing, and has not been able to review Squires' previous testimony.

Zerniak refused to allow Plaintiff to ask him any further questions, such as to clarify which side or area of the head on which CO Burns allegedly was hit. Id.

Bumpus testified by phone that on the day of the incident, Diaz was coming out of his cell to go to the law library when Bumpus heard "a ruckus going on" and saw "two officers . . . holding [Diaz] on the floor. [Diaz] was saying what are you doing this for, I didn't do nothing, I didn't do nothing, what are you doing this for? And then all of a sudden then officer [B]urns was holding him down on the floor punching him in the face." RH.32-33. Bumpus did not see Diaz punch Officer Burns. RH.33. Plaintiff was permitted to ask what Bumpus heard the corrections officers say as they were assaulting him, but Bumpus's response was not recorded, as it was inaudible. Id. Plaintiff was permitted to ask whether Bumpus heard the corrections officers give a reason why Plaintiff was assaulted; Bumpus's response was as follows: "(inaudible) the grievance committee is my understanding." Id. At the conclusion of Bumpus's testimony, Diaz stated, "[H]is memory was better last time." RH.34.

No further witnesses testified. Lt. Zerniak took a five-minute recess and then proceeded to read his decision into the record. RH.36. He found Plaintiff guilty of all charges and imposed a more severe penalty than had been imposed after the First Hearing, namely, a recommended loss of 12 months of good time credits in

addition to a 12-month term in SHU and 12 months of lost privileges. RH.36.

Plaintiff appealed administratively, and on August 7, 2008, Director Bezio modified the Rehearing to remove the loss of good time credits, since the penalty was unlawful under DOCCS regulations. <u>See</u> Director Bezio's Review of Hearing dated 8/07/08 (stating that the "penalty imposed at rehearing cannot exceed the penalty imposed at the original hearing"), Terrizzi Ex. H (Dkt #28-7).

Plaintiff then filed a <u>pro</u> <u>se</u> administrative proceeding pursuant to Article 78 of the New York Civil Practice Law and Rules in state court. The Appellate Division, Third Department, of New York State Supreme Court ("the Third Department") annulled the disciplinary determination and directed DOCCS to expunge all references to the matter from Plaintiff's institutional record. <u>Matt of Diaz v. Fischer</u>, 70 A.D.3d 1082, 894 N.Y.S.2d 218 (3d Dep't 2010). In relevant part, the Third Department held that Plaintiff had been denied both his statutory and constitutional right to call witnesses at the Rehearing.

## III. Procedural History in This Court

Proceeding <u>pro</u> <u>se</u>, Diaz timely commenced the instant lawsuit.

### A.   Defendants' Motion to Dismiss

Defendants filed a partial motion to dismiss several causes of action and the claims against several of the supervisory

defendants. In a Decision and Order dated November 6, 2013, the Court granted Defendants' motion to dismiss (i) Plaintiff's First Claim alleging a violation of the equal protection clause, (ii) all claims against Commissioner Fischer and Wende Superintendent Robert Kirkpatrick ("Sup't Kirkpatrick") based on their lack of personal involvement; and (iii) the claim based on CO Burns' filing of a false misbehavior report on the ground that, without more, such an allegation failed to state a constitutional claim.

Defendants did not move to dismiss the following claims, which the Court allowed to proceed: (i) the Second Claim, insofar as it asserts claims of retaliation under the First Amendment and an excessive use of force under the Eighth Amendment, and which seeks to hold CO Burns and CO Moran directly liable for the April 7, 2008 assault; (ii) the Second Claim, which alleges that Sgt. Kintzel failed to intervene to stop the April 7, 2008 assault on Plaintiff by his subordinates, CO Burns and CO Moran; (ii) the Third Claim, insofar as it alleges that Lt. Zerniak committed due process violations at the re-hearing and that Director Bezio failed to remedy these errors on administrative appeal.

### B. The Pending Cross-Motions for Summary Judgment

On January 17, 2013, defendants Director Bezio and Lt. Zerniak moved for partial summary judgment (Dkt #21) with regard to the claims against them in Plaintiff's complaint, namely, that Lt. Zerniak denied Plaintiff's constitutional rights at the

Rehearing, and that Director Bezio failed to remedy on appeal the constitutional violations committed by Lt. Zerniak.

Plaintiff, through counsel, filed a cross-motion for partial summary judgment (Dkt #26), seeking judgment as a matter of law with regard to his claims against Lt. Zerniak and Director Bezio.

The summary judgment motions are now fully submitted. As discussed further below, the Court grants Plaintiff's summary judgment motion (Dkt #26) in part and denies it part. The Court denies Defendants' partial summary judgment motion (Dkt #21) in its entirety. In addition, the Court reinstates Plaintiff's due process claim against CO Burns based on the filing of a false misbehavior report.

## IV. General Legal Principles

### A. 42 U.S.C. § 1983

In order to state a claim under 42 U.S.C. § 1983 ("Section 1983"), the plaintiff must establish the following elements: (1) conduct attributable at least in part to a person acting under color of state law, and (2) the deprivation, as the result of the challenged conduct, of a right, privilege, or immunity secured by the Constitution or laws of the United States. Dwares v. City of New York, 985 F.2d 94, 98 (2d Cir. 1993). To prevail, the Section 1983 plaintiff must adequately demonstrate "personal involvement of defendants in alleged Constitutional deprivations." Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995). "Personal involvement

of a supervisory official may be established 'by evidence that:
(1) the [official] participated directly in the alleged
constitutional violation, (2) the [official], after being informed
of the violation through a report or appeal, failed to remedy the
wrong, (3) the [official] created a policy or custom under which
unconstitutional practices occurred, or allowed the continuance of
such a policy or custom, (4) the [official] was grossly negligent
in supervising subordinates who committed the wrongful acts, or
(5) the [official] exhibited deliberate indifference to the rights
of [others] by failing to act on information indicating that
unconstitutional acts were occurring.'" Johnson v. Newburgh
Enlarged School Dist., 239 F.3d 246, 254 (2d Cir. 2001) (quoting
Colon, 58 F.3d at 873) (alterations in original)).

    **B.    Summary Judgment Standard**

    Under F.R.C.P. 56, if there is "no genuine issue as to any
material fact . . . the moving party is entitled to a judgment as
a matter of law . . . where the record taken as a whole could not
lead a rational trier of fact to find for the non-moving party."
Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475
U.S. 574, (1986). Initially, the movant bears the burden of
demonstrating the absence of a genuine issue of material fact.
Adickes v. S.H. Kress and Co., 398 U.S. 144, 157 (1970). This
burden may be met by demonstrating that there is an absence of
evidence to support the non-movant's case. Celotex Corp. v.

Catrett, 477 U.S. 317, 323 (1986). The non-movant then has the burden of coming forward with "specific facts showing that there is a genuine issue for trial," FED. R. CIV. P. 56(e). This requires the non-movant to make "a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

In determining whether there are genuine issues of material fact, the reviewing court is "'required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'" Johnson v. Killian, 680 F.3d 234, 236 (2d Cir. 2012) (quoting Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003); internal quotation marks omitted in original); see also Adickes, 398 U.S. at 158–59. Nonetheless, the Court still must inquire whether "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and may grant summary judgment if the non-movant's evidence is "merely colorable" or "is not significantly probative[.]" Id. at 249–50 (citations omitted). The same standards apply where, as here, the parties have filed cross-motions for summary judgment. Morales v. Quintel Entertainment, Inc., 249 F.3d 115, 121 (2d Cir. 2001) (citations omitted). "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must

be drawn against the party whose motion is under consideration." Id. (citing Schwabenbauer v. Board of Educ., 667 F.2d 305, 314 (2d Cir. 1981)). It is with these considerations in mind that the Court addresses the instant motions.

## V. Discussion

### A. Failure to Provide Pre-Hearing Assistance at the Rehearing

#### 1. Background

After the First Hearing but before the Rehearing, Plaintiff was transferred from Wende to Upstate Correctional Facility ("Upstate"), where he was confined to SHU. On June 18, 2008, Plaintiff met with CO R. Holland ("CO Holland"), his assigned employee assistant at Upstate. Plaintiff avers that he since he had just been moved to Upstate, he did not yet have any of his documents from the First Hearing, and therefore could not identify some of the witnesses by their name or inmate number. Plaintiff asserts that he explained to CO Holland that he needed help identifying other witnesses who were present on the gallery at Wende when the April 7, 2008 incident occurred, including the inmate who had preceded Plaintiff out of the gallery gate on his way to the law library. According to Plaintiff, CO Holland informed him that there was nothing he could do in regards to interviewing any witnesses at Wende because he (CO Holland) was at Upstate. See Diaz Aff., ¶ 2. CO Holland completed an Assistant Form on June 18, 2008, indicating "[n]one" with regard to all of the following:

requests for inmate witnesses to be interviewed, potential staff witnesses, and other requests. See Terrizzi Ex. B (Dkt #28-2, p. 9 of 15). Plaintiff signed the form. See id.

At the Rehearing, Lt. Zerniak noted that the "records . . . indicate[d] that [Plaintiff] did not request any assistance. . . ." RH.3. Plaintiff stated that was "because [CO Holland] couldn't help [him] with anything[.]" Id. Lt. Zerniak did not inquire further into this subject.

### 2. Relevant Law

In Wolff v. McDonnell, 418 U.S. 539 (1973), the Supreme Court held that an inmate facing disciplinary charges that could result in punitive segregation is entitled, at a minimum, to advance written notice of the charges against him and of the evidence available to the factfinder. Id. at 563–64. Thus, Wolff recognized that an inmate facing disciplinary charges must have an opportunity to marshal the facts and prepare a defense. See id. The Second Circuit has held that prison officials have a constitutional obligation to provide substantive assistance to an inmate in marshaling evidence and presenting a defense. Eng v. Coughlin, 858 F.2d 889, 897–98 (2d Cir. 1988). The Second Circuit recognized in Eng that "[c]onfinement in SHU is a factor which, like illiteracy or complexity of charges, makes it nearly impossible for an inmate to formulate a defense, collect statements, interview witnesses, compile documentary evidence, and otherwise prepare for a

disciplinary hearing." 858 F.2d at 897. Accordingly, when an inmate is "disabled either by being confined full-time to SHU or transferred from the prison in which the incidents occurred, the duty of assistance is greater because the inmate's ability to help himself is reduced." <u>Id.</u> at 898 (citation omitted). In short, the Second Circuit concluded, "[i]f the inmate's right to marshal evidence and present a defense to charges of breaches of prison disciplinary rules is to mean anything, then an inmate so disabled must be provided with some assistance." <u>Id.</u>

### 3. Application

Here, Plaintiff was disabled in two ways: he was transferred from the facility where the incident occurred and the witnesses still resided, and he was confined in SHU. In <u>Ayers v. Ryan</u>, 152 F.3d 77 (2d Cir. 1988), the Second Circuit held that the defendant hearing officer, who had undertaken to act as the plaintiff's inmate assistant, violated the plaintiff's due process rights where the defendant "admit[ted]" that "'as of the commencement of the hearing . . ., he hadn't returned plaintiff's handwritten list, hadn't interviewed plaintiff's witnesses, nor had he received any of plaintiff's requested documents[.]'" <u>Id.</u> at 81. The Second Circuit held that "[t]his failure of assistance is just the sort . . . . found to violate an inmate's limited due process rights in <u>Eng</u>." <u>Id.</u>

As noted above, Plaintiff has asserted that CO Holland informed him that he would not assist him in locating and interviewing witnesses because all of the potential witnesses were at Wende and CO Holland was at Upstate. CO Holland, unlike the defendant in Ayers, has not admitted that he failed to render any assistance to Plaintiff. And, the documentary evidence indicates that Plaintiff "signed off" on the assistance form, thereby agreeing with statements on the form to the effect that he had no requests for assistance or witnesses. Accordingly, the record presents genuine issues of material fact as to whether Plaintiff was totally denied prehearing assistance by CO Holland.

To the extent Defendants argue that, as a matter of law, CO Holland cannot be faulted because Plaintiff did not provide him with the names or inmate numbers of any potential witnesses, this is unpersuasive. As noted above, Plaintiff has submitted a sworn statement averring that he informed CO Holland about the First Hearing, that he requested assistance from CO Holland in identifying and interviewing inmates at Wende and explained that he was unable to provide CO Holland with names and inmate numbers because, as a result of his recent transfer from Wende to Upstate, he did not have any of his legal documents, including the records from the First Hearing. CO Holland, being a DOCCS employee, presumably could have obtained a copy of the witness list and transcript from the First Hearing and provided it to Plaintiff so

he could have referred to it in drafting his request for assistance to CO Holland. However, CO Holland did not do so.

While the present record suggests that Plaintiff has a strong claim based on the denial of pre-hearing legal assistance, the Court cannot find as a matter of law for Plaintiff or Defendants without resolving issues of credibility, which it is not permitted to do on summary judgment. As the discussion of the evidence above shows, there are genuine issues of material fact as to whether CO Holland violated Plaintiff's limited due process right to pre-disciplinary hearing legal assistance, and whether Lt. Zerniak and Director Bezio are liable in a supervisory capacity for failing to rectify any such deficiencies.

### B. Failure to Call Witnesses at the Rehearing

#### 1. Relevant Law

The Supreme Court has recognized that an inmate has a conditional due process right to call witnesses when to do so will not be unduly hazardous to institutional safety or correctional goals. <u>Wolff</u>, 418 U.S. at 566. In <u>Fox v. Coughlin</u>, 893 F.2d 475 (2d Cir. 1990) (<u>per curiam</u>), the Second Circuit "held that prison authorities may not refuse to interview an inmate's requested witnesses 'without assigning a valid reason.'" <u>Ayers</u>, 152 F.3d at 81 (quoting <u>Fox</u>, 893 F.2d at 478). In <u>Fox</u>, the inmate asked his hearing officer to interview seven witnesses who had been present when the inmate allegedly pushed an officer. The hearing officer

interviewed five of the witnesses, but declined to interview the two others because he believed that their testimony would be "redundant." 893 F.2d at 477. The Second Circuit concluded that, when a prison official refuses to conduct an interview, "[t]he burden is not upon the inmate to prove the official's conduct was arbitrary and capricious, but upon the official to prove the rationality of his position." Id. at 478 (citation omitted); accord Kingsley v. Bureau of Prisons, 937 F.2d 26, 30-31 (2d Cir. 1991) (citing Ponte v. Real, 471 U.S. 491, 499 (1985)). Thus, the prison official bears the burden of showing that the denial of witnesses is "logically related to preventing undue hazards to 'institutional safety or correctional goals[,]'" Fox, 893 F.2d at 478 (quoting Wolff, 418 U.S. at 566), or is justified due to "irrelevance or lack of necessity," Kingsley, 937 F.2d at 30-31 (citation omitted).

### 2. Application

#### a. Failure to Call Inmate Kenneth Jones

At both the First Hearing and Rehearing, Plaintiff identified inmate Kenneth Jones ("Jones") as a witness with personal knowledge of the incident at issue. As noted above, inmate Bumpus testified at the First Hearing that the inmate in "two cell", which was near the front of the gallery where the incident occurred, saw and heard the incident at issue. It turns out that Jones was housed in "2 cell". See Assistant Form dated 4/9/08 (CO McGregor noting,

*inter* *alia*, that he met with Jones, housed in C-16-2, and Jones agreed to testify).

Plaintiff asserts that even though Jones had agreed to testify, he had asked his employee assistant at the First Hearing, CO McGregor, to obtain a statement from Jones because he was afraid Jones would be intimidated into not testifying. However, CO McGregor did not get a statement from Jones. Plaintiff's fear was realized because, on the day he was called to testify, Jones signed an Inmate Refusal Testify form stating he "d[id]n't want to get involved." See "Inmate Refusal Testify" form signed by Kenneth Jones, Deutsch Ex. A.

At the Rehearing, Plaintiff explained the situation involving Jones' previous refusal to testify to Lt. Zerniak. See RH.5. However, Plaintiff did not have Jones' full name or inmate number. RH.5. Lt. Zerniak did not attempt to determine Jones' full name or inmate number, which presumably would have been readily available to him as a DOCCS hearing officer. Indeed, Defendants have submitted what is described as a "copy of the rehearing packet" which, in addition to documents completed by Lt. Zerniak at the Rehearing, also contains multiple documents from the First Hearing, including Jones' "Inmate Refusal Testify" form and "Witness Interview Notice". See Deutsch Ex. A. It would be reasonable to infer that these documents were available to Lt. Zerniak at the time of the Rehearing. At the very least, it would be reasonable to

conclude Lt. Zerniak would have been in a better position to ascertain Jones' identity than Plaintiff, who was hampered by his recent transfer from Wende and his confinement to SHU. Lt. Zerniak, as a DOCCS hearing officer, also obviously would have been in a better position to locate Jones, contact him, and determine if he still was refusing to testify, or to ask a fellow DOCCS officer at Wende to conduct this investigation for him.

The resolution of those inferences aside, the Court finds that Lt. Zerniak's conduct, as a matter of law, violated clearly established Federal law. Lt. Zerniak made no determination on the record that Jones' testimony was irrelevant or unnecessary, or that his appearance as a witness would pose safety concerns or interfere with correctional goals. See Fox, 893 F.2d at 478; Kingsley, 937 F.2d at 30-31. Lt. Zerniak thus has not carried his burden of providing a reason for denying the request, let alone "proving the rationality of [his] position[,]" Kingsley, 937 F.3d at 30-31 (citation omitted). The Court notes that if Jones had agreed to testify, he very likely would have offered highly relevant testimony, corroborative of inmate Bumpus' account of hearing Plaintiff get punched, yell out in protest, and then get mobbed and assaulted by several corrections officers. As noted above, Bumpus testified at the First Hearing that Jones had been standing at the bars of his cell near the gallery gate when the incident occurred. Bumpus heard Jones make a comment to the effect of, "'[W]hy you

doin' that to him. He ain't doin' nothin.'" Thus, it appears that Jones actually witnessed the incident. Moreover, Lt. Zerniak could not credibly argue that Jones' testimony would have been cumulative to Bumpus' testimony, given that he discounted Bumpus' account to the extent that it was based only on what Bumpus heard, rather than saw. Even if Lt. Zerniak had found Jones' testimony to be irrelevant or cumulative, such a finding would not have been supportable. See Fox, 893 F.2d at 478 (rejecting hearing officer's proffered reasons for refusing to interview the witnesses requested by the inmate because officer "had no reason to believe that the testimony of the two [witnesses] would be redundant").

Defendants assert that any refusal to call Jones was harmless because Jones refused to testify at the Rehearing. However, the Inmate Refusal Testify form on which Defendants rely is from the First Hearing. Defendants' reliance on documentation that was part of the First Hearing is contradictory to Lt. Zerniak's on-the-record comment to Plaintiff, "This is a rehearing. Anything that was done at the other hearing has no bearing on this hearing because I have no idea how the other hearing was conducted. Basically this is just like having a whole new hearing." RH.3. Defendants cannot have it both ways, and therefore the Court reject's Defendants' attempt to rely on the record of First Hearing as proof that Jones refused to testify at the Rehearing.

The Court also finds unpersuasive Defendants' post hoc assertion that a renewed inquiry into Jones' willingness to testify would have been futile. Prison officials cannot take advantage of a record that is missing a witness' testimony as a result of the officials' obstruction of the inmate's attempts to secure the witness' testimony. See Patterson v Coughlin, 905 F.2d 564, 569 (2d Cir. 1990) ("[T]o the extent that the record is silent as to what [the witnesses] would have testified in response to questions pertinent to the charge against [the inmate], the State is not entitled to rely on that record to show that [the inmate] would have been found guilty of that charge, since the record's silence is the result of the State's violation of [the inmate]'s due process rights."). The Court notes that in addition to Lt. Zerniak's obstruction of Plaintiff's attempt to identify and re-interview Jones, there is circumstantial evidence from which a factfinder reasonably could infer that other DOCCS' staff members obstructed Plaintiff's right to call witnesses by intimidating Jones into not testifying. As noted above, two days after the incident, Jones was willing to testify on Diaz's behalf; two weeks later, on the day of the hearing, he refused to testify. The timing, as well as Jones' explanation for not testifying–that he did not want to "get involved"–suggest an external factor at play in his sudden about-face.

In sum, the Court finds that, as a matter of law, Lt. Zerniak's handling of Plaintiff's request to call Jones violated Plaintiff's due process right to call witnesses on his behalf. Director Bezio is liable in a supervisory capacity because, "after being informed of the violation through . . . an appeal, [he] failed to remedy the wrong," Colon, 58 F.3d at 873.

### b. Failure to Call the Inmate in Cell C-15-7

Plaintiff twice identified an inmate by his cell number, C-15-7, as a witness he wanted to call on his behalf. Plaintiff explained that he had been told by Squires that this inmate had relevant testimony to offer because he (the inmate in C-15-7) had been on the unit at the time of the incident. RH.5, 16. Plaintiff stated that he had been unable to contact this inmate because, as discussed above, he was at Upstate while the inmate was still at Wende. Plaintiff has averred that his inmate assistant, CO Holland, refused to contact any witnesses at Wende for him. Lt. Zerniak did not attempt to contact or call the inmate in C-15-7 as a witness, and he made no attempt to determine the relevancy of his testimony. Indeed, Lt. Zerniak ignored Plaintiff's comments regarding the inmate in C-15-7. Given that Lt. Zerniak ignored the existence of this potential witness, he obviously did not make a finding that calling him would pose a threat to institutional safety or correctional goals, or that his testimony was irrelevant, unnecessary or redundant. See Fox, 893 F.2d at 478; Kingsley, 937

F.2d at 30-31. To the contrary, it is likely that this inmate would have offered relevant testimony given that he was present on the gallery when the incident occurred. As Lt. Zerniak has failed to fulfill his obligation to provide any reason for denying the request for the inmate in C-15-7, he cannot "prov[e] the rationality of [his] position[,]" <u>Kingsley</u>, 937 F.3d at 30-31 (citation omitted). The Court accordingly finds as a matter of law that Plaintiff's due process right to call witnesses on his behalf was violated by Lt. Zerniak's omissions in regard to Plaintiff's request for the inmate in C-15-7 as a witness at the Rehearing. Director Bezio is liable in a supervisory capacity because, "after being informed of the violation through . . . an appeal, [he] failed to remedy the wrong," <u>Colon</u>, 58 F.3d at 873.

### c. Failure to Call Investigator James Kessel of DOCCS' Inspector General's Office

Diaz attempted to call Inv. Kessel from the Inspector General's Office, with whom he had met on April 25, 2008, one day after the conclusion of the First Hearing. According to Diaz, he presented to Inv. Kessel his complaints that his first employee assistant, CO McGregor, had failed to go on the galleries of the cell block where he was housed to canvass for potential witnesses. Plaintiff gave Inv. Kessel the names of the witnesses who had testified at the First Hearing or had been identified at the First Hearing. According to Plaintiff, Inv. Kessel "told [Plaintiff] he would canvass the galleries to see if he could find anyone who had

seen or heard what happened. He told [Plaintiff] he would talk to Jones who had first agreed to testify and then refused[.]" Diaz Aff., ¶ 24.

At the Rehearing, Lt. Zerniak denied Inv. Kessel as a witness on the ground that he was "not in the area of the alleged incident" and thus, according to Lt. Zerniak, did not have relevant testimony to offer. Lt. Zerniak offered no other reasons for denying Inv. Kessel as a witness.

In connection with Plaintiff's state court Article 78 proceeding, the Third Department recognized this as an error warranting the reversal and expungement of the Rehearing. See Matter of Diaz v. Fischer, 70 A.D.3d 1082, 1082-83 (3d Dep't 2010). The Third Department observed that Petitioner's defense at the First Hearing and Rehearing was that, contrary to the accusation that he assaulted CO Burns (whom he had never met) without provocation, he was actually attacked by CO Burns in retaliation for his work with the IGRC. Diaz, 70 A.D.3d at 1082.[7] The Third

---

[7]

Plaintiff acknowledged that he did not know CO Burns and had never filed a grievance against him, but argued to Lt. Zerniak that CO Burns' assault on him "show[ed]. . . facility retaliation against [him] because they did not want [him] to join the grievance office." RH.19. It was Plaintiff's theory that the staff in the IGRC Office who did not want him serving as a representative purposely recruited an officer whom Plaintiff did not know to "set him up" by assaulting him and then using force against him as a pretext for filing a misbehavior report, which would lead to charges and a disciplinary hearing, and which would have the practical effect of disqualifying him from serving as an elected IGRC representative. As Plaintiff pointed out, and as CO Burns admitted, CO Burns was not the regular officer on Plaintiff's gallery on the day of the incident; Plaintiff told Lt. Zerniak that he had no problems with the regular officers, CO Kwas and CO Martin. RH.19-20. Plaintiff noted that he did not have any staff assaults during his 22 and 1/2 years in DOCCS, and it made no sense for him "to punch a guy in the face [he] [did]n't even know." Id.

Department explained that Inv. Kessel could have offered relevant testimony on Plaintiff's asserted defense, because he began an investigation shortly after the April 7, 2008 incident and, in addition to questioning the witnesses who had testified at the First Hearing, was planning to interview witnesses who had refused to testify out of fear of retaliation by DOCCS' staff. <u>Matter of Diaz</u>, 70 A.D.3d at 1082-83. The Third Department pointed out that "investigators from the Inspector General's office routinely testify in prison disciplinary hearings, as do other witnesses who have gained information through investigation, rather than personal observation." <u>Id.</u> at fn* [sic] (internal and other citations omitted). Because Inv. Kessel "may have provided testimony that was material, [his] absence substantially prejudiced [Plaintiff]' ability to present his defense[,]" and since Lt. Zerniak denied Inv. Kessel's testimony "for reasons other than institutional safety," the Third Department found "such denial to be error[.]" <u>Matter of Diaz</u>, 70 A.D.3d at 1083 (citations omitted). The Third Department further found that since the deprivation constituted a violation of Plaintiff's "constitutional right to call witnesses, rather than merely his statutory right," the "the appropriate remedy [was] . . . expungement." <u>Id.</u>

The Court can find no basis for disagreement with the Third Department's reasoning or its conclusion that Lt. Zerniak's refusal

to allow Inv. Kessel as a witness amounted to a denial of Plaintiff's constitutional right to call witnesses. Defendants argue that the refusal to call Inv. Kessel would have had no impact on the disciplinary hearing because he allegedly did not interview anyone other than Plaintiff. See Declaration of James Kessel ("Kessel Decl."). The Court is not persuaded. Even if Inv. Kessel did not interview witnesses, he still could have testified regarding the information he had gained through his investigation. See 70 A.D.3d at 1082-83, fn*.

The Court notes, as an aside, that the documentary evidence submitted by Plaintiff tends to undermine Inv. Kessel's assertion that he interviewed no other witnesses. In response to a FOIL request for Inv. Kessel's investigation file, Plaintiff's attorney received a redacted portion of the entire file. See Diaz Ex. E (Dkt #23-5). The pagination of the documents provided indicates that there are at least 76 pages in the file, since Inv. Kessel's summary of his interview with Plaintiff is page number 76. See Diaz Aff., ¶¶ 25-26 & Diaz Ex. E (Dkt #23-5). The lengthiness of the redacted FOIL response concerning Inv. Kessel's investigatory documents is difficult to reconcile with Inv. Kessel's assertion that he did not interview *any* individuals other than Plaintiff during his investigation.

To summarize, the Court concludes as a matter of law that Lt. Zerniak failed to fulfill his obligation to prove the

rationality of his reason for denying the request for Inv. Kessel. First, Inv. Kessel could have provided relevant, material testimony. Second, Lt. Zerniak did not deny Inv. Kessel's testimony on the basis of concerns regarding institutional safety or correctional goals. Therefore, the Court finds that Lt. Zerniak violated Plaintiff's constitutional right to call witnesses by denying his request for Inv. Kessel. Director Bezio is liable in a supervisory capacity because, "after being informed of the violation through . . . an appeal, [he] failed to remedy the wrong," Colon, 58 F.3d at 873.

### d. Failure to Call Psychologist Dr. Bush

Dr. Bush of OMH interviewed Plaintiff shortly after the use-of-force incident. Plaintiff requested Dr. Bush as a witness at the First Hearing, and this was denied. Director Bezio reversed the First Hearing because CHO Kennedy failed to indicate how Plaintiff's mental health was considered as required by New York State regulations. See Letter dated 11/20/08 from Director Bezio, Terrizzi Ex. G1b (Dkt #28-2, p. 7 of 15) (in response to Plaintiff's inquiry regarding the basis for the reversal of the First Hearing, Director Bezio stated that "[t]he reason given in [Diaz's] records is that 'the record fails to indicate how the inmate's mental health was considered as required by Chapter V'").[8]

---

[8] The reference to "Chapter V" is to Title 7, Chapter V, Subchapter A of the New York State Administrative Code which provides in part that "[w]hen an inmate's mental state or intellectual capacity is at issue, a hearing officer

In reversing the Rehearing, the Third Department held, in relevant part, as follows:

> The Hearing Officer also denied testimony from the psychologist [Dr. Bush], despite the fact that the first determination finding petitioner guilty had been administratively reversed based on the fact that the record failed to indicate how petitioner's mental health status was considered.

Matter of Diaz, 70 A.D.3d at 1083 (internal and other citations omitted). The Third Department concluded that Dr. Bush, like Inv. Kessel, "may have provided testimony that was material," and his "absence substantially prejudiced [Plaintiff]'s ability to present his defense[.]" Id. at 1083. Because Lt. Zerniak denied Dr. Bush's testimony "for reasons other than institutional safety," the Third Department found that "such denial . . . [was] error" and "constituted a violation of [Plaintiff]'s constitutional right to call witnesses, rather than merely his statutory right[.]" Id. (citations omitted). Accordingly, the Third Department found that this was an additional basis for ordering expungement of the Rehearing. See id.

Although the Third Department found that Dr. Bush's testimony may have been material, this Court has no basis on which to make such a finding, as it has not been provided with any treatment notes or reports by Dr. Bush regarding his interview with Plaintiff, let alone the sum and substance of Dr. Bush's proposed

_____

shall consider evidence regarding the inmate's mental condition or intellectual capacity at the time of the incident and at the time of the [disciplinary] hearing. . . ." 7 N.Y. COMP. CODES R. & REGS. § 254.6(b).

testimony. In the "rehearing packet" submitted as Deutsch Ex. A, there is a form titled, "Superintendent Review of Disciplinary Dispositions For Inmates Where Mental Health Was At Issue" which was completed by Sup't Kirkpatrick, who declined to change Plaintiff's confinement time on the basis that Plaintiff "is not an active OMH patient[;] he was seen as part of the SHU OMH screening process and his mental health status had not [sic] impact on the incident." <u>See</u> Superintendent Review of Disciplinary Dispositions For Inmates Where Mental Health Was At Issue, Deutsch Ex. A. Defendants seem to suggest that this form disposes of Plaintiff's claim regarding Dr. Bush, but the Court cannot agree. The form contains an unexplained discrepancy in that it is dated and signed April 20, 2006, yet purports to pertain to a disciplinary hearing on April 11, 2008. Furthermore, it does not shed any light on the substance of Dr. Bush's interview and assessment of Plaintiff, or why Director Bezio reversed the First Hearing because Plaintiff's mental health was not considered.

In short, on the present record, the Court is unable to find in either Plaintiff's or Defendants' favor as a matter of law on this claim. There are genuine issues of fact that remain to be decided, and which cannot be resolved on the record before the Court. Summary judgment therefore is denied to both Plaintiff and Defendants on this claim.

**C.  Erroneous Curtailment of Plaintiff's Right to Present a Defense and Question Witnesses**

### 1.  Relevant Law

As noted above, due process requires that an inmate be given a meaningful opportunity to marshal and present evidence in his defense. See Wolff, 418 U.S. at 564, 570. To that end, the inmate should ordinarily be permitted to call witnesses and present documentary evidence in his defense, so long as "permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." Id. at 566. Unlike a defendant in a criminal proceeding, an inmate does not have a constitutional right to confront or to cross-examine the witnesses against him. See Baxter v. Palmigiano, 425 U.S. 308, 322 (1976) ("Mandating confrontation and cross-examination, except where prison officials can justify their denial on one or more grounds that appeal to judges, effectively preempts the area that Wolff left to the sound discretion of prison officials.") (footnote omitted).

### 2.  Application

Plaintiff asserts that his right to meaningfully present a defense and adequately question inmate witnesses Rosales and Bumpus and staff witness CO Burns was unconstitutionally curtailed by Lt. Zerniak at the Rehearing. Plaintiff also argues that he was improperly denied a documentary request for CO Burns' medical records.

With regard to the restriction on Plaintiff's questioning of Rosales, Bumpus, and CO Burns, the Court agrees that Lt. Zerniak violated Plaintiff's due process rights. Plaintiff was not seeking to cross-examine any of the witnesses, which the Court recognizes is not a constitutional right guaranteed to inmates. See Baxter, 425 U.S. at 322. Furthermore, Lt. Zerniak did not make any finding that allowing Plaintiff to question these witnesses would be "unduly hazardous to institutional safety or correctional goals[,]" Wolff, 418 U.S. at 566, and there is no suggestion in the record that this was the case. All three witnesses had testified more extensively at the First Hearing without incident. At the Rehearing, the witnesses were testifying by phone from other facilities. Although Lt. Zerniak nominally allowed these individuals to testify at the Rehearing, he limited Plaintiff's right to question them so significantly that it amounted to a denial, in substance, of his right to present a defense.

With regard to Plaintiff's request to review CO Burns' medical records, Lt. Zerniak noted that the records were included among "information that [Plaintiff was] not privileged to." RH.15. The Court has found no basis for the proposition that redacted medical records of a corrections officer are documents to which an inmate categorically is "not privileged". Indeed, New York State courts have found error where a hearing officer unjustifiably denies an inmate's request for the medical records of a corrections officer

whom the inmate allegedly assaulted. See, e.g., Matter of Joseph v. Fischer, 67 A.D.3d 1103, 1104 (3d Dep't 2009) ("agree[ing] with [inmate accused of assault on staff] that the Hearing Officer should not have denied disclosure of the injured correction officer's medical records absent a showing that institutional safety would have been jeopardized", but finding error harmless considering "overwhelming evidence" against inmate) (citations omitted). Here, Lt. Zerniak made no finding that CO Burns' medical records were irrelevant or unnecessary; indeed, they would have been relevant to Petitioner's defense that he did not strike CO Burns at all and to potentially undermining CO Burns' credibility about how the incident occurred. Likewise, Lt. Zerniak did not find that disclosure of the medical records would have jeopardized facility safety or correctional goals. Moreover, given the paucity of evidence supporting CO Burns' rather vague and shifting description of the incident, it is impossible for the Court to say that the error was harmless. Accordingly, the Court finds that Lt. Zerniak violated Plaintiff's right to present a defense by unjustifiably curtailing his questioning of witnesses and denying him access to redacted copies of CO Burns' medical records in regards to the April 7, 2008 incident. The Court finds that Director Bezio is liable in a supervisory capacity because, "after being informed of the violation through . . . an appeal, [he] failed to remedy the wrong," Colon, 58 F.3d at 873.

### D.  Biased Hearing Officer

#### 1.  Relevant Law

Prisoners are entitled to have their disciplinary charges reviewed by an unbiased hearing officer. See Russell v. Selsky, 35 F.3d 55, 59 (2d Cir. 1994) ("Due process requires that a prison disciplinary hearing be impartial.") (citation omitted). The Second Circuit has held, however, that "prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts," and "the degree of impartiality required of prison officials does not rise to the level of that required of judges generally." Allen v. Cuomo, 100 F.3d 253, 259 (2d Cir. 1996) (citations omitted). The Second Circuit's conception of "an impartial decisionmaker is one who, inter alia, does not prejudge the evidence and who cannot say . . . how he would assess evidence he has not yet seen." Patterson v. Coughlin, 905 F.2d 564, 569–70 (2d Cir. 1990) (citation omitted).

#### 2.  Application

Throughout the hearing, Lt. Zerniak's comments evidenced an attitude of disparagement, bordering on frank disbelief, of everything Plaintiff said. In repeatedly preventing Plaintiff from conducting virtually any direct examination of witnesses, he made comments indicating he had already formed an opinion about the outcome of the case See, e.g., RH.31 ("[Y]ou punched him, and then force took place. I don't need to ask him[.] [D]o you have anything

else to ask."). Without any explanation of why a harsher sentence was warranted, Lt. Zerniak sentenced Plaintiff after the Rehearing to a more severe punishment on the exact same charges. In the criminal context, a lengthier sentence following a successful appeal can give rise to an inference of vindictiveness or retribution for the defendant's vindication of his constitutional rights. See, e.g., North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). In sum, Plaintiff has come forward with much more than a "mere conclusory allegation," Francis v. Coughlin, 891 F.2d 43, 47 (2d Cir. 1989), that Lt. Zerniak was not impartial. Summary judgment in Defendants' favor is not warranted on this claim.

### E.   Qualified Immunity

#### 1.   Relevant Law

In actions under 42 U.S.C. § 1983, qualified immunity is an affirmative defense which allows officials to escape liability unless their "alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Williams v. Smith, 781 F.2d 319, 322 (2d Cir. 1986) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982)). Qualified immunity in a civil rights matter generally involves two inquiries: (1) "whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation"; and (2) "whether it would be clear to a

reasonable [official] that his conduct was unlawful in the situation confronted." Sira v. Morton, 380 F.3d 57, 68–69 (2d Cir. 2004) (citations omitted).

## 2. Application

Defendants simply assert that there is "no authority that the rehearing was unconstitutional" and therefore it was "objectively reasonable for the Defendants to believe that their actions did not violate Plaintiff's due process rights." Defendants' Memorandum of Law at 12-13. However, the Court has found, as a matter of law, that the Rehearing was flawed by multiple constitutional violations, namely, the denial of Plaintiff's right to call witnesses and present evidence in his defense. Furthermore, all of the rights which Plaintiffs allege Defendants violated were clearly established at the time of the challenged conduct.[9] Defendants do not attempt to argue otherwise. The Court accordingly rejects Defendants' qualified immunity argument.

## F. Reinstatement of False Misbehavior Report Claim

The Court had previously dismissed Plaintiff's due process claim against CO Burns for filing a false misbehavior report because the filing of baseless or false charges against an inmate does not, in and of itself, give rise to a constitutional violation. See Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986)

---

[9]

For instance, a prisoner's right to call witnesses was initially recognized in 1974, see Wolff, 418 U.S. at 556, and was clearly established in 1979, see McCann v. Coughliin, 698 F.2d 112, 124-25 (2d Cir. 1983).

(stating that an inmate "has no constitutionally guaranteed immunity from being falsely accused of conduct which may result in the deprivation of a protected liberty interest"; stating that "[s]ince Freeman was granted a hearing, and was afforded the opportunity to rebut the charges against him, the defendant's filing of unfounded charges did not give rise to a per se constitutional violation actionable under section 1983"). The Second Circuit suggested in Freeman that an inmate may have an actionable claim against a correction officer for filing a false misbehavior report if the inmate can show that he was disciplined without adequate due process "as a result of" the report. See Freeman, 808 F.2d at 951-53 ("Plaintiff suffered as a result of the finding of guilty by the prison disciplinary committee hearing, and not merely because of the filing of unfounded charges by the defendant. Since the validity of the hearing is also in issue, the court must now determine whether the disciplinary hearing provided Freeman with due process."). In Freeman, the Second Circuit found no due process violations at the hearing based on the allegedly false misbehavior report and thus implicitly denied the inmate's claim based on the filing of the false report. Here, the Court has found as a matter of law that various constitutional violations occurred at the Rehearing based on CO Burns' allegedly false Misbehavior Report issued on April 7, 2008, and that there are issues of fact as to Plaintiff's other due process claims related

to the Rehearing. The Court accordingly finds that Plaintiff has a viable claim against CO Burns based on the allegedly false misbehavior report.

The Second Circuit has mentioned a second circumstance that could give rise to a due process claim based on a false misbehavior report, that is, where the inmate alleges that the false report was filed against him in retaliation for his exercise of a constitutionally protected right. See Franco v. Kelly, 854 F.2d 584, 589-90 (2d Cir. 1988) (reversing grant of summary judgment where prisoner claimed that false disciplinary charges were filed against him as retaliation for his cooperation with a state investigation into alleged inmate abuse; "[a]lthough those allegations do not directly implicate Franco's right of access to the courts or similar judicial forums, we believe that his complaint does implicate his broader right to petition government for redress of grievances, as guaranteed by the First and Fourteenth Amendments"). Plaintiff has asserted a claim of retaliation by Wende staff based on his filing of grievances and participation on the IGRC, and argues that the false misbehavior report was part of this retaliatory campaign. Therefore, the Court finds that Plaintiff has stated a viable due process claim under the theory articulated in Franco, 854 F.2d at 589-90.

## VI. Conclusion

For the reasons discussed above, defendant Lt. Zerniak's and Director Bezio's motion for summary judgment (Dkt #21) is denied in its entirety. Plaintiff's motion for summary judgment (Dkt #26) against Lt. Zerniak and Director Bezio is granted in part and denied in part. Specifically, judgment as a matter of law is granted in Plaintiff's favor against Lt. Zerniak and Director Bezio with regard to his claims that he was denied his right to call Kenneth Jones, the inmate in C-15-7, and Inv. Kessel as witnesses at the Rehearing, that he was denied his right to present a defense by questioning witnesses at the Rehearing, and that he was denied his right to present a defense by being refused redacted copies of CO Burns' medical records generated following the use of force incident. Plaintiff's motion for summary judgment against Lt. Zerniak and Director Bezio is denied without prejudice as to the remaining claim involving these two defendants. The Court reinstates Plaintiff's due process claim against CO Burns based on the filing of a false misbehavior report.

**SO ORDERED.**

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:    September 3, 2015
          Rochester, New York

-43-